**SO ORDERED.**

**SIGNED this 9 day of February, 2017.**

_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

IN RE:                                                                                        CASE NO. 14-00792-5-DMW

**SCOTT ANSON KORBIN**
**MARY WITSCHEY KORBIN**

                                                                                              CHAPTER 13

                        **DEBTORS**

## ORDER DENYING MOTION TO INCUR DEBT

This matter comes on to be heard upon the Amended Motion to Obtain Credit and Purchase Real Property with Motion to Modify Plan ("Amended Motion")[1] filed by Scott Anson Korbin ("Mr. Korbin") and Mary Witschey Korbin ("Ms. Korbin") on November 19, 2016 and the Trustee's Response in Objection to Debtors' Amended Motion to Obtain Credit and Purchase Real Property with Motion to Modify Plan ("Response")[2] filed by John F. Logan, Esq. ("Trustee"),

---

[1] The Amended Motion amended and supplemented the Motion to Obtain Credit and Purchase Real Property ("Initial Motion") filed on September 17, 2016 and the Memorandum in Support of Motion to Incur Debt ("Debtors' Memorandum") filed on November 17, 2016. The court held a hearing on the Initial Motion on November 2, 2016, at the conclusion of which the court requested the Debtors and the Trustee file memoranda in support of their respective positions on the matter.

[2] The Response supplemented the Trustee's Response in Objection to Debtors' Motion to Incur Debt filed on October 3, 2016. The Trustee also filed a Memorandum in Support of Trustee's Objection to Debtors' Motion to Incur Debt ("Trustee's Memorandum") on November 28, 2016. The Debtors filed a Reply to Trustee's Memorandum on Debtors' Motion to Incur Debt ("Reply") on December 6, 2016.

Chapter 13 trustee, on November 22, 2016. The court conducted a hearing in Raleigh, North Carolina on December 7, 2016. Marty E. Miller, Esq. appeared for Mr. Korbin and Ms. Korbin (collectively "Debtors"), and Michael B. Burnett, Esq. appeared for the Trustee. Based upon the pleadings, the arguments of counsel and the case record, the court makes the following findings of fact and conclusions of law:

1. This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

2. The Debtors filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code on February 7, 2014 ("Petition Date"). The court appointed the Trustee to fulfill the duties as provided in 11 U.S.C. § 1302.

3. On Schedule A filed with the court, the Debtors listed real property located at 208 Midenhall Way, Cary, North Carolina ("Midenhall Property") owned by the Mary W. Korbin Living Trust ("Trust"), of which Ms. Korbin is the sole settlor and both Debtors are trustees.[3] The Debtors lease the Midenhall Property to third-party tenants and reside at 111 W. Park Street, Cary, North Carolina ("Park Property"). According to Schedule J filed with the court, the Debtors pay $2,247.00 per month for the lease of the Park Property. The Initial Motion and Amended Motion state that the Debtors continue to pay $2,247.00 per month for the Park Property, but the Debtors' Memorandum states that the Debtors' rent has increased to $2,379.00. The Debtors' rent amount includes payments for taxes and insurance on the Park Property.

---

[3] The Trustee asserts in the Trustee's Memorandum that "[t]he facts set forth in the [Debtors' Memorandum] make clear that the Midenhall Property is a financial responsibility of the Debtors. The Trustee believes this financial responsibility, coupled with the revocable nature of Mrs. Korbin's trust, bring the financial circumstances of the Midenhall Property squarely before this court, particularly when considering the instant Motion to Incur Debt."

2

4. The Debtors' Chapter 13 plan ("Plan"), confirmed September 22, 2014, requires gross payments to the Trustee in the amount of $28,575.00 and states the Plan "shall not end prior to completion of the [Debtors' 60 month] applicable commitment period unless all allowed general unsecured claims have been paid in full." The Debtors scheduled general unsecured claims totaling $262,861.76 on Schedule F filed with the court, and allowed unsecured claims total $31,693.09. The Plan projects a 22% dividend to be paid to allowed unsecured creditors. The Plan does not distinguish between joint unsecured debts and unsecured debts owed individually by the Debtors.

5. The Plan states that the Debtors will make direct payments, rather than payments through the Trustee, to HSBC Bank USA, N.A. ("HSBC") and SunTrust Bank ("SunTrust"), holders of first and second priority deeds of trust, respectively, secured by the Midenhall Property as of the Petition Date.

6. Sometime in early 2016, the Debtors and the owner of the Park Property entered into an agreement for the Debtors to purchase the Park Property. The parties agreed that the sale price would increase each month until the contemplated sale closed. On May 19, 2016, the Debtors received a qualification letter from Sierra Pacific Mortgage Company, Inc. ("Sierra") that determined preliminarily that the Debtors qualified for financing in the amount of $350,000.00 for the purchase of a property in the amount of $460,000.00. That preliminary qualification expired in August, 2016.

7. The Initial Motion[4] filed on September 17, 2016 stated that the contemplated purchase price of the Park Property was $480,000.00; Ms. Korbin's family would be assisting the

---

[4] The Initial Motion was filed pursuant to Local Bankruptcy Rule 4002-1(g) which states a "debtor shall not purchase additional property or incur additional debt of $7,500 or more without prior approval from the court." E.D.N.C. LBR 4002-1(g)(5).

3

Debtors in paying the $96,000.00 (20%) down payment; and the Debtors were seeking a new prequalification from Sierra for a $388,800.00 loan. The Amended Motion restates those same facts and adds that Sierra would require the Debtors to pay the balance of their Chapter 13 Plan payments, estimated in the Amended Motion to be $13,095.00, in a lump sum prior to closing. At the hearing, the Trustee stated it was his understanding that lump sum would be coming from Ms. Korbin's parents. The Amended Motion includes a request to modify the Plan to provide for a lump sum payment of $13,095.00, followed by 27 monthly payments in the amount of $225.00. The proposed amendment would result in creditors receiving approximately $6,000.00 more than under the current Plan, but the Debtors would enjoy a reduction in their monthly payment to the Trustee by almost $260.00.

8. The sale price of the Park Property yet again increased to $482,000.00[5] on November 1, 2016. The Debtors filed on December 1, 2016 an updated letter from Sierra indicating a preliminary prequalification for a loan in the maximum amount of $384,000.00.

9. The Debtors estimate that the mortgage payments to Sierra, plus taxes and insurance, would total $2,317.99[6] per month, approximately $61.00 per month less than the Debtors are paying currently to rent the Park Property. The Debtors assert their monthly financial obligations would remain consistent, and possibly be reduced, if the court were to allow the Amended Motion. They further contend that the contemplated purchase is in the Debtors' best interests because purchasing the Park Property would allow the Debtors to begin building equity in a second property.

---

[5] The Amended Motion states the price of $480,000.00, but the Debtors' Memorandum reveals the sale price increased to $482,000.00 on November 1, 2016.

[6] This amount was recited in the Reply. In their pleadings the Debtors have used monthly mortgage estimates of $2,317.99, $2,263.00, and $2,214.00. The court will use the highest of these amounts to capture the anticipated escrow for taxes and insurance.

4

10. The Debtors' Memorandum states that in the spring of 2015, the tenant who had been renting the Midenhall Property moved out, and by early October, 2015, the Debtors were unable to maintain their obligation to HSBC without rental income.[7] In November, 2015, the Debtors entered into an agreement ("Agreement") with LiveWell Assisted Living, Inc. ("LiveWell"), whereby LiveWell would lease the Midenhall Property for a five-year term beginning January 1, 2016 and would subsequently purchase the Midenhall Property on December 31, 2020 for $660,000.00. Under the terms of the Agreement, LiveWell paid to the Debtors a due diligence payment ("Due Diligence Payment") of $75,000.00 between November 27, 2015 and January 19, 2016.

11. The Debtors' Memorandum reveals that the Debtors, without notifying the court or the Trustee about the Agreement or the Due Diligence Payment, have spent $68,620.46 of the Due Diligence Payment to pay the junior lien of SunTrust in full,[8] conduct repairs and improvements on the Midenhall Property totaling $17,193.71 and pay various other expenses related to maintaining the Midenhall Property and preparing it for LiveWell's tenancy. The Reply provides an amended itemization of expenditures made from the Due Diligence Payment and asserts $66,592.46 has been spent and the sum of $8,407.54 of the Due Diligence Payment remains.

---

[7] The Debtors do not state whether they were able to meet the financial obligations to SunTrust, but the court assumes that they were not able to make those payments as well.

[8] SunTrust filed a proof of claim in the amount of $94,703.45 on February 25, 2014. The note ("Note") in favor of SunTrust matured on December 22, 2014. According to the Debtors' Memorandum, after the Note matured, Debtors' counsel discovered a possible defect in the Note and deed of trust ("DOT") securing the Note, in that the Note was executed by Mr. Korbin only and the DOT was executed by the Debtors individually, rather than as trustees of the Trust. After receiving the Due Diligence Payment, the Debtors remitted $25,000.00 to SunTrust in full satisfaction of its claim. Without any explanation by the Debtors, the Trustee was excluded from participating in the settlement. The court is amazed at the Debtors' audacity and lack of compliance with the bankruptcy process.

## The Debtors Should Not Be Permitted to Incur Debt to Purchase the Park Property

12. The Debtors argue that in determining the Debtors' best interest, the court should consider the difference between a reduction in monthly expense through the debt service on a new loan compared with the current rent payment. That simplistic analysis is a wonderful indication of how financially ignorant the Debtors truly are. A mortgage comes with serious and long-term financial obligations. A lease agreement for residential real property, while still financially burdensome, is less onerous than a mortgage. A lease can be a commitment with an annual renewal, where a mortgage is a more substantial multi-year commitment. Of course, the Debtors will not build equity and enjoy income tax benefits from the interest expense while they are leasing property, but they will not assume personal financial liability for a very large debt that could frustrate the success they have already experienced under their Plan. The Debtors confess that without a tenant in the Midenhall Property, they were unable to service the debt on that asset. Adding additional secured debt of over $380,000.00 to the Debtors' financial obligations will only increase the risk that the Debtors will default on a secured debt in the future.

13. The Debtors' request to incur debt is distinguishable from requests to incur debt to replace an inoperable vehicle so that a debtor can travel to work or to refinance an existing mortgage debt in order to reduce ongoing payments. In those instances, the debtor is either replacing similar debt amounts or reducing them. In this case, the Debtors are seeking to incur approximately $388,000.00 in additional debt and related personal liability where none existed as of the Petition Date.

14. The Debtors seek to take advantage of what they believe is a terrific price for the Park Property for their own benefit, while they ask their creditors to accept less than what is owed. The Debtors assert, self-righteously, that even if funds from the Due Diligence Payment were

required to be paid into the Debtors' estate, only Ms. Korbin's unsecured creditors should benefit because the Midenhall Property is owned by her Trust. The distribution of the Due Diligence Payment is not an issue the court is currently considering, but the court notes that the Plan makes no distinction between individual and joint unsecured debts in its repayment provisions.

### The Debtors Should Have Disclosed to the Trustee the Due Diligence Payment

15.     Although the Debtors' receipt and subsequent spending of the Due Diligence Payment is not before the court at this time, the courts finds that the Debtors should have disclosed the Due Diligence Payment to the Trustee immediately upon receipt.

16.     At the hearing the Debtors focused on the reasonability of the amount of the Due Diligence Payment. Under the Agreement the Debtors will not be permitted to market the Midenhall Property for five years, and the significant Due Diligence Payment is consistent with that marketing concession. The negotiated amount of the Due Diligence Payment is reasonable, but the failure to involve the Trustee in the process is wholly unreasonable and borderline outrageous, even if the money were used to prepare the Midenhall Property to be leased by LiveWell.

17.     The Debtors also argue that because, under the Plan, mortgage payments were to be made directly to HSBC and SunTrust, the Debtors did not need to consult the Trustee when they paid SunTrust in full. With all of the counseling that the Trustee gives creditors and the express rules that this court provides to those under its jurisdiction, the Debtors' assertion is far from believable. Even more incredulous is the Debtors' assertion that they were not required to disclose the Due Diligence Payment because no transfer of the Debtors' interest in the Midenhall Property occurred. When the Debtors filed their petition for relief, they received an Order and Notice to Debtor that stated "***You must promptly notify your attorney and the trustee of any . . .***

*change in financial status or employment during the time this case is pending.*" (emphasis in original).  The Debtors have shown a cavalier disregard for their responsibilities as Chapter 13 debtors.

18. Even if the cavalier approach to the SunTrust payment and the use of the Due Diligence Payment could be forgiven by the court, which they are not, the Debtors clearly cannot make good financial decisions.  The idea of purchasing the Park Property and incurring more debt while feebly attempting to repay creditors surely is born of poor judgment.  While the Debtors are under this court's jurisdiction, the court will not allow them to squander their reorganization and the potential "fresh start" in this Chapter 13 case; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1. The Amended Motion, including its proposed modification of the Plan, is denied, and the Debtors shall not be permitted to incur debt to purchase the Park Property; and

2. The Trustee is directed to investigate and report on the Debtors' failure to disclose timely their receipt of the Due Diligence Payment and the use of those funds.

END OF DOCUMENT